## DUNBAR et al *v.* BULLARD.

The accounts-current between principal and factor are necessarily provisional until settled; and, even after settlement, may be rectified by either party on account of errors and omissions.

Where a factor sends an account to his principal at the usual time, in which certain imputations are made by the former, and the latter approves it, or receives and acquiesces in it, and no fraud or surprise is complained of, the imputations of payment must be considered as having been made by the authority of the principal, the ratification of the acts of the factor being tantamount to original imputations by the principal, and relating back to the time of the acts which are the subject of the ratification.

The verdict of a jury on a question of fact will not be interfered with, unless it be contrary to the evidence, or violate some rule of law.

The contract by which a particular partnership is formed must be in writing, where any part of the partnership stock is to consist of real estate. C. C. 2807.

Partnership property must be applied to the payment of partnership debts, in preference to those of the individual partners. C. C. 2794.

APPEAL from the District Court of Rapides, *Campbell,* J. The defendant and *Clanton* were ordinary partners in the cultivation of a plantation in the parish of Rapides, and *Lambeth & Thompson,* the real plaintiffs in interest, were, for many years, their factors in New Orleans. In 1836, the defendant and *Clanton* purchased a tract of land, and, for the last instalment of the price, a note was made by them for $6,670, jointly and severally, payable to the order of the vendor, *Neal,* and secured by a special mortgage and the vendor's privilege. This note was transferred before maturity to *R. C. Martin. Martin* was a debtor of *Lambeth & Thompson,* who, in December, 1838, wrote to him that : " *Bullard,* having heard that *Neal* has passed off the note of B. & C., has called upon us with an urgent request that we would pay it. We must, therefore, take the note of you as cash, the day it is due. You will please enclose it to us by first boat, and it shall be passed to your credit." *Martin* forwarded the note to *Lambeth & Thompson,* without any endorsement but that of the original payee, and *Martin's* account was credited with the amount. *Lambeth & Thompson* subsequently put the note in circulation, and this suit is instituted upon it by the plaintiffs as holders, against *Bullard* as maker, and *Neal* as endorser. Plaintiffs acquired the note after maturity. The judg-

ment below, rendered on the verdict of a jury, was in favor of the endorser, but against *Bullard*, as maker. The latter alone has appealed. The other material facts are stated in the opinion of the court.

*Dunbar, Hyams* and *Elgee, pro se.* The sole defence is, that *Lambeth & Thompson*, from whom the plaintiffs received the note sued upon, had been the factors and commission merchants of *Bullard & Clanton* for many years before and after the maturity of the note sued upon ; that they (*B. & C.*) had shipped their crops to their said factors ; and that the note sued on, being the most burthensome debt, the first moneys that came into their hands from said crops, should have been applied to the extinction and discharge thereof.

To meet this special defence, plaintiffs contend that their transferrers did impute the proceeds of said cotton to the payment of such debts as they had a right to impute them to, to wit, the payment of the drafts of said *Bullard & Clanton*, and cash, provisions, supplies and other advances made by them in the regular course of business ; and secondly, that even if the defendant could at the time have required a special, or other application of the fund, that not having done so, and having for years acquiesced therein, neither law nor equity will now permit him to change the imputation. C. C. 2161. 2 Pothier, Obl. 528, 529. C. N. 1255-7. Duranton, no. 193. Paillette, notes to art. 1255 C. N.

On the trial the defendant opposed the introduction of the accounts of *Lambeth & Thompson*, and notes signed by him, and the testimony of the witness *Edmund Harding*, to prove the same, or any other imputation of the moneys received by *Lambeth & Thompson* than to the notes sued on, on the ground that plaintiffs had not declared upon such accounts or sued to recover the amounts thereof, &c., and because no notice had been given him, that such accounts would be introduced, and that nothing but a receipt accepted by the debtor could be admitted, &c. This reasoning goes to the effect of the testimony, and not to its admissibility. The testimony was legally admitted. The plaintiffs proved the defendants note, and asked for judgment. The defendant shows that at certain times, sums of money had come into the hands of plaintiffs' transferers, which he contends extinguished the note. The plaintiffs, then, by rebutting evidence had the right of showing that these funds were applied to pay other debts of the defendant—and further too, that defendant had acquiesced therein. It being a plea of payment, it was incumbent on the defendant clearly to make out his case (C. C. 2229) ; and we had the right of opposing to it every legal defence ; and there exists no necessity of giving him notice that he owed other debts, which it was his duty to discharge first.

The defendant contends that this was a pure factorage transaction between himself and his merchants, and that it was the same as if he had written an order on them in favor of *Martin*. He further contends, that, therefore, when they purchased the note, or paid *Martin* for it, it was a dead piece of paper in their hands, and they only had a right of charging him with so much money laid out and expended for his use ; that this view of it must prevail because *Lambeth & Thompson* took the note from *Martin* without any express subrogation ; and that there was no legal subrogation, as it was taken up at his request, and could only form against him an item in an account-current. To complete the defendant's hypothesis, it is presumed that it will be contended, that being a mere charge in an open account interest ceased on the note, and that his solidary liability was destroyed, and he only bound for half as an ordinary partner. We contend that the transfer to them of the note transferred all the right attached to it (C. C. art. 2615), without the necessity of subrogation.

But the plaintiffs urge that it was not such a transaction as the defendant supposes ; and that there is ample evidence to the contrary in the record ; and if there was not, that it would result from those grave presumptions, which, in the absence of positive evidence, influence men, and govern their actions in their intercourse with each other. The evidence shows that, at the close of the business season in 1838, *Bullard & Clanton* owed their merchants a balance of $12,547 98, for which they executed their two notes, bearing ten per cent interest after maturity, one for $6,246 37, due 2d and 5th of January, 1839, and one $6,301 61, due 1st and 4th February, 1839, and that *Bullard & Clanton's* additional liabilities and payments to be met out of the crop which went to market in the spring of 1839, was some $14,000, about $3,000 of which the merchants had also advanced between July, 1838, and 1st January, 1839. It is fair

to presume that *Lambeth & Thompson* were aware of the position of *Bullard & Clanton*, and of the heavy debt they had to meet, and that they only consented to acquire the note from *Martin* because it was solidary and bore ten per cent per annum interest, with the vendor's lien and privilege. This was not intended as a factorage transaction—*Bullard & Clanton* were heavily indebted to them—they had an interest in preventing others from holding a debt of so high a character, and consented to become the owners because, by taking up the note, they acquired the right of their transferrers; and doubtless that was their inducement and the true understanding at the time. The defendant maintains an affirmative, that he has extinguished a debt by some legal method, and he must make it appear; he has failed in doing so, and he must take the consequences of the conclusion that, in matters of doubt, the construction put upon an act, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation. The imputation made by the creditor shows his view of it, and the knowledge of that fact by the defendant implies his assent thereto. The relations of the parties, the testimony of the book-keeper, showing the regular adjustment and making up of the accounts—their delivery to *Mr. Thompson* to be delivered to defendant—his frequent visits to their counting-house—his acknowledgment on the record, and production of so much of the accounts of sales as he considered necessary for the establishment of his defence—his silence for four successive crops, and all the surrounding circumstances, leave on the mind not the shadow of doubt of the defendant's knowledge of the imputation of the proceeds of the cottons in the year 1839 to the discharge of other debts of *Bullard & Clanton*, regularly created in their factorage transactions—and so the jury and the court below concluded.

The defendant in order to avoid the effect of a knowledge of the application of the crop in question, denies that he ever acquiesced in the application, by urging that it was enough for him to see that "the account contained the usual reservations of errors excepted," and "that he had no curiosity to look into it, until a final settlement," and "that he never was called upon for such final settlement."

In the case of *Bloodworth* v. *Jacobs, ante* p. 24, this court said, in relation to the reception of accounts-current and their effect, that article 2161 of the Civil Code relative to the imputation of payments was applicable, to wit: that when the debtor had accepted a receipt, by which the creditor has made an imputation of money he has received to one debt the debtor cannot change the imputation, unless in case of fraud or surprise. In the case of *Millaudon* v. *Arnaud*, 4 La. 545, the court said: "It was the duty of the defendant to have made his objections to the plaintiff in a reasonable time; and the act of receiving the account-current, and retaining it for so long a period without observation or opposition, is an assent to the application which the plaintiff made of the funds of the defendant." If further authority is necessary on this point, it is to be found in the case of *Flower* v. *Jones*, 7 Mart. N. S. 143, where the principle is settled, that when one party receives accounts, without making objection to the conduct of the other's acts, it is considered as complete an acquiescence therein as if he had expressly done so. See Merlin, Questions de Droit, *verbo* Compte-courante, vol. 1, p. 482. Pailliette, note to art. 1985 Code Napoléon.

The defendant lastly contends that there had been surprise on his part; that it is not shown that he had any knowledge that *Lambeth & Thompson* had taken up the note, until the account was rendered; that he had no intimation previously thereto, that the payments made by *Bullard & Clanton* were imputed in a particular manner. Were this position tenable, it would not avail the defendant after four or five years silence. It was the place of the defendant at once, on the receipt of the account, to have set up his objection thereto, or at least within a reasonable time. Duranton says (vol. 7, No. 193, in commenting on art. 1255, which is the same as art. 2161 of the Civil Code,) where a debtor is deceived in the imputation made by the creditor, it is his duty immediately to set up his opposition to the imputation, otherwise it would be presumed he had acquiesced in it; and as the law has affixed no prescription within which to do so after having discovered the fraud or surprise, this should be a matter left to the tribunals to judge, according to the circumstances of the case, if there has been a ratification or not of the fraudulent imputation.

*H. A. Bullard, pro. pers.* and *Roselius,* for the appellant. I. The note

having been paid by the defendant's agents and factors, at his request, was by that fact alone extinguished, and could not be revived and put in circulation, leaving to the mandataries their right to be reimbursed, the note remaining in their hands merely as a voucher in support of that item of their account with their principals, *Bullard & Clanton.*

It is clear the note was not received by *Lambeth & Thompson* in the ordinary course of business, but that it was paid at the request of *Bullard.* It was paid as the note of *Bullard & Clanton*, and is so referred to in their letter to *Martin.* They took no transfer from *Martin*, no subrogation; they had no interest in paying other than as factors of *Bullard & Clanton*, in the daily expectation of receiving their crop, out of which this advance would be more than reimbursed. It is a maxim as ancient as the Roman law, and retained as a formal text by Justinian, " *Qui mandat solvi, ipse videtur solvere.*" The payment, therefore, made by *Lambeth & Thompson*, was a payment by *Bullard & Clanton.* The amount paid was an advance to *Bullard & Clanton*, which formed a charge against them in the account-current to be rendered by their mandataries or factors. The note, after it had been taken up by order of the maker, ceased to have any force as evidence, *per se*, of an existing obligation. It had done its office. Could the endorser be again exposed to the risk of paying? Could the note be resuscitated as to him? The defence did prevail as to him, and the plaintiffs have not appealed. Could it be extinguished as to one party, and not as to another? We contend that the only right of *Lambeth & Thompson* is to recover what they had advanced to take up the note, by the *actio mandati contraria.*

Duranton, says: " Bien plus, un tiers qui n'est nullement intéressé à l'extinction de la dette peut la payer au nom et en l'acquit du débiteur, sauf ce que nous dirons bientôt en parlant des obligations de faire. Cette disposition a lieu également quoique le débiteur s'oppose au paiement de sa dette : car la maxime "*Invito beneficium non dari,*" n'est point applicable à ce cas, &c. Quand nous disons qu'il est permis à un tiers tout-à-fait étranger à l'obligation, de l'acquitter, nous entendons principalement cela du cas où il agit au nom de ce débiteur, en lui procurant sa libération ; car, s'il agissait en son nom propre, il pourrait bien, à la vérité, payer la dette, mais il ne pourrait. dit cet article, être subrogé aux droits du créancier. Cependant cette dernière disposition a besoin de quelque explication. D'abord il n'en faut pas inférer, par contraire, que si le tiers agissait au nom du débiteur, il serait nécessairement subrogé aux droits du créancier : ce serait une erreur de le croire, lors même que le paiement serait fait du consentement du premier, si les formalités prescrites par l'article 1250,2°, n'étaient pas observées, seulement, si le créancier le veut, il peut, aux termes de la première disposition du même article, consentir à la subrogation, pourvu qu'il le fasse lors du paiement et non depuis ; car la dette une fois éteinte ne saurait revivre. L. 76 ff de Solut. Duranton, Paris ed. of 1820, vol. 3, nos. 701 and 702, pp. 61 and 63.

The same author in subsequent paragraphs enumerates several cases in which a third person pays the debt of another. First, when it is done in the name of the debtor and to discharge him, but with subrogation—there is no difficulty ; it is in truth a change of creditor under the name of payment. But he proceeds to say, 2dly : " Le paiement fait par le tiers, aussi au nom et à l'acquit du débiteur, mais sans subrogation : alors il y a véritablement extinction de la dette, et le tiers n'a contre le débiteur ainsi libéré, que la simple action de gestion d'affaire" &c. No. 784, p. 175.

In this case it is manifest, that *Lambeth & Thompson* paid in the name, and at the request, and as the mandataries of the debtor, and that they took no transfer of the note, much less a conventional subrogation to the rights of *Martin*, the then holder of the note. Nor had they an interest in paying, which would operate a legal subrogation.

Let us suppose that, between the time the note in question came into the hands of *Lambeth & Thompson* and the institution of this suit, the five years from its maturity had elapsed, could *Bullard* have pleaded the prescription of five years? Most clearly not, according to these principles, because the payment by an agent or a *negotiorum gestor* creates a new debt against the principal, to be recovered, by what the Roman law terms the *actio mandati contraria*, or as it is expressed by the French jurists, "*l'action de gestion d'affaires.*" See Duranton, no. 787. In the same work, the author treats the question. whether

if the original obligation contained a special election of domicil, the third person, paying without subrogation, could avail himself of that right? And he decides that he could not, but would be bound to prosecute at the real domicil of the debtor. See no. 786. These are, in fact, but corollaries from the settled principle, that the original obligation is absolutely extinct, and forms nothing more than the basis or consideration of a new indebtedness which dates from the payment. These principles would have been applicable, even if this had been the only transaction between *Bullard*, or *Bullard & Clanton*, and *Lambeth & Thompson*. If the former had requested the latter to pay their note, and they had consented to do so, that alone would have created the relation of mandatary and principal between them in relation to that transaction, and the payment by them would have been a payment by *Bullard & Clanton* to every legal intent. See Pothier, Mandat. *A fortiori*, when that relation already existed —when they were in the habit, and had been for years, of acting as the general agents and factors of *Bullard & Clanton*, and admit in their letter to *Martin*, that their intention was to pay the note for the drawers. This being the case, how could they legally, or with any propriety, after holding the note for several years, again put it in circulation? How could they revive an obligation to pay a sum of money to the order of *Neal*, which had been extinguished by their own act, and when they were not holders as the endorsers of *Neal*? How could they revive the obligation of *Neal*, the endorsser? It is true, as it may be contended, that a note endorsed in blank by the first endorser, passes by mere delivery; but in this case the whole evidence repels the idea that *Lambeth & Thompson* received the note in that way. There never was any privity of contract between them and *Neal*, or between them and *Martin*. They took the note from *Martin* as cash, on the day it fell due, and he regarded the transaction as a payment made by *Bullard & Clanton*, through their agents; and we repeat the old maxims: " *Qui mandat solvi, ipse solvere videtur*," and " *Qui facit per alium, facit per se*."

Towards *Lambeth & Thompson*, *Bullard*, as a partner, never was liable for more than one half of the amount due to them by the partnership; and although, as to *Neal*, the parties were originally bound *in solido*, yet for any advances made to the firm by *Lambeth & Thompson* to pay the note, the partners were bound only each for one half. The putting of the note in circulation by *Lambeth & Thompson*, was contrary to their duties and obligations as the mandataries of *Bullard & Clanton*, and charged by them to pay the debt. Story says, in so many words, that an agent employed to settle a debt, cannot purchase it for his own account, and he cites the case of *Reed* v. *Norris*, 2 M. & Craig, 361, 574, and his own Equity Jurisprudence, vol. 1, § 321, 322. He adds: "Indeed it may be laid down as a general principle that in all cases where a person is either actually or constructively an agent for other persons, all profits and advantages made by him in the business, beyond his ordinary compensation, are to be for the benefit of his employers." Story on Agency, § 211, p. 250.

II. Even supposing *Lambeth & Thompson* to have been the holders of the note when it fell due, and subrogated to all the rights of the original payee, it was extinguished within three months, by imputation of payment, by the proceeds of cotton sold by *Lambeth & Thompson* for the makers.

It was the most onerous debt due by *Bullard & Clanton* to that house. It was secured by mortgage and vendor's privilege, on a valuable part of their plantation, and bore an interest at ten per cent after maturity, if not punctually paid. It was besides, first due. It ought to be premised, that the open account between *Bullard & Clanton*, and the house of *Lambeth & Thompson*, commencing in July, 1838, when the last settlement took place, was neither due nor liquidated in January, 1839, when the mortgage note fell due, nor at the time the remittances were made, which we contend ought to have been, and were by operation of law, imputed to the payment of the note. The dealings of *Bullard & Clanton* were, from year to year, and all supplies and advances were made on that term of credit.

The doctrine of imputation of payments has undergone little or no change since the publication of the Pandects. It is now, by our Code, precisely what it was in the age of Justinian. The principles are few and simple. The general rule is, that the debtor of several debts equally due, when he makes a payment, has a right to apply it to whichever debt he thinks proper. When no direction is given by the debtor, the creditor has a right, at the time of pay-

ment, to impute it as he thinks proper, and the debtor will be bound by such application, if he accepts a receipt, showing such special appropriation, given at the time of the payment, *in re agendâ, in re presenti—statim atque solutum est.* If no such special application is made and accepted, expressly, or tacitly, then the law imputes the payment to the debt which the debtor has the greatest interest in paying.

Article 2161 of our Code declares that, "when the debtor of several debts has accepted a receipt by which the creditor has imputed what he has received to one of the debts specially, the debtor can no longer require the imputation to be made to a different debt, unless there has been fraud or surprise on the part of the creditor."

Art. 2162: "When the receipt bears no imputation, the payment must be imputed to the debt which the debtor has the greatest interest in discharging, of those that are equally due."

Toullier, in treating upon the corresponding articles in the Code Napoléon, says: "Si le débiteur ne fait pas l'imputation, le créancier a le droit de la faire, pourvu que ce soit fait à l'instant même du paiement et dans la quittance. Il ne pourrait la faire depuis: comme aussi le débiteur qui n'aurait pas fait l'imputation au moment du paiement, ne pourrait plus la faire arbitrairement sans le consentement du créancier. C'est encore la règle ancienne." In a note he quotes the Digest: "Permittitur ergo creditor constituere, in quod velit solutum..., sed constituere in re præsenti, hoc est statim atque solutum est." " Mais lorsque le débiteur a consenti à l'imputation, en recevant la quittance, en pleine connaissance de cause et sans surprise, il ne peut contredire cette imputation, quoiqu'elle lui soit préjudiciable, suivant la maxime, volenti non fit injuria." 7 Toullier, nos. 176, 177. Pothier is to the same effect. Treatise on Obligations, nos. 528 and 529.

To apply these principles to this case: A receipt is nothing more than a written acknowledgment of payment; whether couched in the form of a letter missive, or an account of sales, showing the amount received, is immaterial. The two letters of *Lambeth & Thompson,* acknowledging the receipt of proceeds of cotton sold and placed to the credit of *Bullard & Clanton,* the one of $6,708 and the other of $2,225, making together nearly $9,000, and dated in March, 1839, about two months after the note fell due, are undoubtedly receipts given at the time, for that amount, and contain no special imputation. The law, therefore, *eo instanti,* made the imputation to the most onerous of the debts then due by *Bullard & Clanton.* If those letters had informed *Bullard & Clanton* that the amounts thus received had been applied by the house to discharge an open account, rather than the notes then due, and no objection had been made at the time, they would have been bound by that application of the fund. But the law having fixed the appropriation in the absence of any such special imputation, it cannot afterwards be changed without the express consent of the debtor. The debt was extinguished, and could not afterwards be revived by any mercantile arts in the mode of stating the accounts between the parties.

But the plaintiffs contend, in the teeth of these well settled principles, that accounts rendered long afterwards, showing a different disposition of those funds, and not objected to within a reasonable time, conclude the defendants. To this we reply that no such accounts ever were rendered to *Bullard,* although they may have been to his partner *Clanton,* and that even if *Clanton* had expressly assented to that mode of stating the accounts and applying the funds, it would not have bound his partner. They were ordinary partners, and neither could bind the other without special authority either in the articles of partnership or otherwise. How then could he bind him by implication? One half of the funds belonged to *Bullard,* subject to his exclusive control and disposition. The testimony is far from showing that *Bullard* ever saw the accounts as rendered. But after all, what do the accounts show? In an account-current, a note held by *Lambeth & Thompson* at the time, is not charged as an item, but at the foot of the account is a remark, that they are holders of the note. Here then the account itself shows the existence of two debts, one by note and the other by account. What had the note to do with the running account of supplies for the platation? The account shows precisely that state of things which gives the debtor a right to choose which he will pay. The account was clearly not due at the time the money came into the hands of *Lambeth & Thompson.* It was not due until July, 1839. It was unliquidated, and consequently they

Dunbar
v.
Bullard.

had no right to make the imputation. But the account does not show any express imputation to the account independently of the note. The credit is general, and the note was referred to as an existing debt due at the time.

According to article 2161 of the Code, the debtor is precluded from insisting on the imputation to the most onerous debt, when he has accepted a receipt by which the creditor has imputed what he has received to one of the debts specially. Now the converse of this proposition must be true, that until such receipt is accepted showing a special imputation, he may insist upon and require the proper imputation. Nothing of the kind is shown here. The account, we repeat, does not show a special imputation, but shows on its face that the higher debt was then due to *Lambeth & Thompson.*

But the rule upon which the plaintiffs appear to rely, has no application to accounts rendered between debtors and creditors. This court is surely not prepared to infer the correctness and justice of an account rendered, merely because no objection was made to it at the time it was rendered. The rule applies only between merchant and merchant, in relation to their dealings with or for each other. It is stated by Judge Story in the following words :

" In respect to silence, whether it operates as a presumptive proof of ratification,may essentially depend upon the particular relations between the parties, and the habits of business and the usages of trade. In the ordinary course of business between merchants and their correspondents, it is understood to be the duty of the one party receiving a letter from the other, to answer the same within a reasonable time, and if he does not, it is presumed he admits the propriety of the acts of his correspondent, and confirms and adopts them." Story on Agency, § 248.

Greenleaf on Evidence, to the same effect, lays down the doctrine of acquiescence in the following explicit terms : "Admissions may also be implied from the acquiescence of the party. But acquiescence, to have the affect of an admission, must exhibit some act of the mind, and amount to a voluntary demeanor or conduct of the party. And whether it is acquiescence in the conduct, or in the language of others, it must plainly appear, that such conduct was fully known, or the language fully understood, by the party, before any inference can be drawn from his passiveness or silence. The circumstances, too, must be not only such as afforded him an opportunity to act or to speak, but such also as would properly and naturally call for some action or reply from men similarly situated." 1 Greenleaf, p. 229, no. 197.

The case of *Bloodworth* v. *Jacobs,* is clearly distinguishable from this. In that case, a third person, without any allegation of fraud, complained of the improper imputations of payment made by a common debtor. Several years had elapsed from the time the payments were made, and there was evidence of a settlement with *Hunter,* and his acquiescence in the disposition of his funds. The whole fund belonged to him. In this case one-half of the fund belonged to *Bullard* as an ordinary partner, and no settlement had taken place. At the time the proceeds of the cotton were received by *Lambeth & Thompson,* the account for provisions for the current year was not due. The course of dealing was from year to year. There had been a settlement in July, 1838, and the funds arose from the sale of the crop of that year, which was sold in January, February and March, 1839. If the fund in the hands of *Lambeth & Thompson,* the factors, is to be regarded as a trust fund, according to the idea of the court in the case alluded to, it could not be disposed of by them contrary to the wishes and interest of the owner of that fund ; and, even if there had been a settlement, it would have been liable to be opened on showing error. In the case of *Bloodworth,* the court seems to have regarded the account rendered as equivalent to the first receipt spoken of in the Code, which was received without objection and therefore conclusive on the debtor. But in this case there was a previous step, to wit: the rendering accounts of sales, and letters acknowledging the receipt of the money, and which do not make the least allusion to a particular appropriation of the fund, and which fund was consequently, by operation of law, applied, *eo instanti,* to the extinguishment of the most onerous debt then due, that is to say, the three notes held by *Lambeth & Thompson.* After receiving these accounts of sales and the letters of *Lambeth & Thompson,* the appellant supposed the proceeds would be by law imputed to the discharge of the most onerous debt, and that it could not afterwards be changed without his consent.

"These accounts," says the court in *Bloodworth's* case, "were necessarily provisional until settled; and, even after settlement, may be rectified by either party on account of errors or omissions, subject to which every settlement is held to be made."

*Texts of the Roman law in relation to payment.*

"Tollitur autem omnis obligatio solutione ejus quod debetur; vel si quis, consentiente creditore, aliud pro alio solverit. Nec interest quis solvat, utrum ipse qui debet an alius pro eo; liberatur enim et alio solvente, sive sciente, sive ignorante debitore." In. lib. 3, t. 30, De Solutione.

"Qui mandat solvi ipse, solvere videtur." Dig. lib. 46.

"Si pro me quis solverit creditori meo, licet ignorante me, adquiritur mihi actio pignoratitia." Ib.

*Frost* and *O. N. Ogden*, on the same side.

The judgment of the court was pronounced by

EUSTIS, C. J. This action is brought by the holders of a promissory note, drawn by the defendant, and *James Clanton* by the defendant as his attorney in fact, for the sum of $6,670, to the order of *Thomas Neal*, and by him endorsed; it is dated on the 17th of October, 1836, and payable on the 1st of January, 1839; it bears ten per cent interest, if not paid when due, and the promise to pay is joint and several between the debtors. There was the verdict of a jury in favor of the plaintiffs in the court below, and the defendant, *Bullard*, appealed from the judgment rendered upon it.

The cause was argued before the late Supreme Court, in October, 1844, and a decree was made, by which the verdict of the jury was set aside, and a new trial ordered. The defendant applied to have the decree set aside and a re-hearing granted, on the ground that the court had not settled the questions raised by his bill of exceptions, which had been taken at the trial to the admission of certain evidence on the part of the plaintiffs. He insisted, in his petition, on his right to have those questions determined by the court, whose decision was to serve as a rule to the court below, as to the admissibility of the evidence, on the new trial, which had been ordered by the decree. In this position we took cognisance of the cause at the last term, and the question then before us was, whether a re-hearing should be granted or not. As the parties in whose favor the decision of the court had been made, themselves applied for a revision of it, we examined the whole case, and, under the deference which we were bound to extend to the opinions of the court which had preceded us, we came to the conclusion that, on the grounds which the defendant assumed, the re-hearing could not be refused. It would be a vain thing in the administration of justice, for an appellate court to award a new trial without deciding on those questions in which it was alleged error had been committed on the first trial, and to determine which the appeal had been taken. But the decision of this court on those points might have a conclusive influence on the final decision of the cause; they might control it; and, notwithstanding the inclination of this court to maintain the decision which awarded a new trial, the view it might take of the questions of law presented by the bill of exceptions and which the facts themselves required to be determined, might prevent its concurrence in that decision. A re-hearing was accordingly granted and the whole case was opened, and has been argued at bar, and by the defendant in person in a printed brief, which we shall consider as presenting the grounds of the defence.

The present plaintiffs are to be considered as nominal, and the controversy as being between the mercantile firm of *Lambeth & Thompson*, of New Orleans, and the defendant. The occasional use of a different social name for the plaintiffs, makes no change in the relations of the parties. As we have not been able

*Margin:* DUNBAR *v.* BULLARD.

to adopt the conclusions to which our predecessors arrived, it is proper that we should set forth our grounds of dissent in a more extended form than any intrinsic difficulty in the case would otherwise warrant. Every point has been elaborately examined, and we have the means before us of determining this litigation in a manner which will do full justice to the parties.

*Bullard & Clanton*, the signers of the note sued on, were partners in the cultivation of a cotton plantation in the parish of Rapides. It was a particular partnership, and the business of the firm appears to have been conducted in the social name of *Bullard & Clanton ;* the partners were not bound *in solido* for the debts of the partnership. *Lambeth & Thompson* were the factors of the partnership in New Orleans, sold the crops, made advances and paid for supplies ; and we may assume that the relations subsisting between them were of principal and factor, which had existed for several years preceding this controversy. There is nothing in the evidence which establishes any other relation between them.

The bill of exceptions taken on the trial of the cause was to the admission of certain evidence, and is thus stated : Be it remembered, &c., the plaintiffs offered in evidence sundry accounts of *Lambeth & Thompson*, and of *W. M. Lambeth & Thompson*, with *Bullard & Clanton*, and offered *Edmund Harding*, a witness, to prove the correctness of the same ; and offered further certain notes purporting to be signed by *H. A. Bullard ;* and also offered further, to prove by the said *Harding* a different imputation of the moneys received by *W. M. Lambeth & Thompson*, from sales of cotton of *Bullard & Clanton*, than to the extinguishment of the debt sued for. To all of which the defendants, by their counsel, objected, on the ground that the plaintiffs have not declared upon said accounts, or sued to recover the amount alleged to be due thereon ; and have given the defendants no notice that such accounts would be introduced, or proof offered in relation to the same ; and on the further ground that, no evidence of a different imputation than to the most burthensome debt can be admitted, except that established by the 2161st article of the Code, to wit : the acceptance of a receipt by the debtor, in which the creditor has imputed what he received to one of the debts specially, that imputation being different from that established by law ; and that, consequently, when the law has established a particular mode of proof no other testimony can be resorted to, unless the absence of legal proof is accounted for. But the court overruled the whole of said objections, and ordered the said testimony to be received ; to all which the counsel except, &c.

The argumentative part of this bill of exceptions, it is unnecessary to notice. As to the questions of law it presents, they are attended with no difficulty whatever in their solution.

It is the duty of the factors to keep accounts of the transactions of their principals, and it was necessary to prove that they were kept, and kept correctly ; and the whole evidence was admissible under the issues presented in the defendant's answer. None of the grounds of objection taken to the evidence are tenable. They go to the effect, rather than to the admissibility, of it. It is all before us, and is strictly legal and pertinent to the cause, under the defence assumed by the defendant. We have given our decision on the points set forth in the bill of exceptions itself, and not, as erroneously stated, in the petition for a re-hearing.

The first point made by the defendant in his printed argument is : " That the

note having been paid by the defendant's agents and factors, at his request, was, by that fact alone, extinguised, and could not be revived and put in circulation, leaving their mandataries their right to be reimbursed, the note remaining in their hands merely as a voucher in support of that item of their account with their principals, *Bullard & Clanton.*" The proof of the fact of payment, on which this argumentative proposition rests, is said to be contained in a letter from plaintiffs to *Martin,* who at the time it was written was the holder of the note. The letter runs thus :

· " New Orleans, December 29, 1838.

·"*R. C. Martin, Esq.*, Dear Sir :—Judge *Bullard,* having heard that Mr. *Neal* has passed off the note of *B. & C.*, has called upon us with an urgent request that *we would pay it.* We must therefore take the note of you as cash the day it is due. You will please enclose it to us by steamboat, and it shall be passed to your credit." It closes with remarks about the scarcity, &c.

On the 6th of Jan. following, *Martin* transmitted the note to the plaintiffs, at their request, and his account was credited with its amount.

This letter is held to be proof that the plaintiffs paid the note on the defendant's account, and gave up the securities of the endorsement, the solidarity, and the mortgage which the note carried with it, becoming the simple creditors of the defendant, or of the partnership of *Bullard & Clanton.* We think otherwise. The note was not yet due ; the defendant undoubtedly requested the plaintiffs to pay it. It would have been to the defendant a very advantageous conversion of an onerous debt into a demand against him in account-current; but we have no evidence that the factors assented to it. They paid the note to *Martin,* because they could not get it otherwise. As to him, as he did not endorse the note, payment was made—the business was closed ; but the drawers and endorser were entirely unaffected by any thing contained in the letter, or transaction with *Martin.*

The conduct of the plaintiffs and defendant is conclusive as to the character of this transaction, if it were susceptible of any doubt in its origin. Nay, the very answer and argument of the defendant refutes this pretence. The answer expressly charges that the note, before maturity, was transferred to the plaintiffs, who have, ever since January, 1839, until recently, been the holders thereof; that by the imputation which the law itself makes, the note has been paid by the proceeds of the crops of *Bullard & Clanton,* which the plaintiffs had received since the note fell due, and thus the note has been extinguished by the imputation of these payments. This payment to *Martin* was not even pleaded ; but the extinguishment by reason of the imputation of the proceeds of the crops, was alone charged in the answer, which is under oath. This point of defence has no foundation whatever.

The second is : " That even supposing *Lambeth & Thompson* to have been holders of the note when it fell due, and subrogated to all the rights of the original payee, it was extinguished within three months by the imputation of payment, by the proceeds of cotton sold by *Lambeth & Thompson* for the makers." And it is further contended that, if the imputation is not made, the partnership funds must be considered to be in the hands of the plaintiffs unapplied and subject to a final settlement, and that *Bullard & Clanton* have a right to insist on such an application of it as to stop the onerous interest the note bears, leaving to the plaintiffs their recourse against the partners, each for their one-half, for the balance which may be due on account.

DUNBAR
*v.*
BULLARD.

It is contended that no imputation of payment was made by the creditors or debtors, and that in that case the law makes it. that the mortgage note was the most onerous, and that which the debtors had at the time the most interest in discharging ; and that it became extinguished by the proceeds of the crops of the partnership, which the plaintiffs had received. It becomes necessary to enquire if no imputation was made. The plaintiffs insist that an imputation was made of the partnership funds to the partnership debts, consisting of advances and supplies for the plantation.

In the case of *Bloodworth* v. *Jacobs*, *ante* p. 24, we had occasion to examine the subject of the imputatio i of payments, in reference to the ordinary transactions between planter and factor. We considered that accounts between these parties, without respect to any particular agreement, were necessarily provisional until settled, and even after settlement may be rectified by either party on account of errors or omissions. We held that when, at the usual time of rendering his accounts, the factor sends his account to his principal, in which certain imputations of payment are made by him, and the latter approves it, without any fraud or surprise, the payments are considered as having been made by the authority of the debtor himself; and the ratification of the acts of the agent is considered as tantamount to an original imputation of payment by himself, and relates back to the time of the doing of the act which is the subject of the ratification.

The dealings of *Bullard* & *Clanton* with the plaintiffs were from year to year, and all supplies and advances were made on that term of credit. There are accounts of each year, which are taken from the books of the plaintiffs, in which the note sued on does not appear ever to have been charged to the partnership. On the contrary, at the foot of each account a memorandum is made to this effect: "N. B. We hold your mortgage note, due 1–4 January, 1839, in favor of *Thomas Neal*, for $6,670."

These accounts, showing the disposition made of the partnership funds from year to year, and not objected to within a reasonable time, it is contended, conclude the defendant. To this it is answered that, no such accounts were ever rendered to the defendant, although they may have been to his partner *Clanton;* but if *Clanton* had expressly assented to that mode of stating the accounts and applying the funds, it would not have bound his partner.

The verdict of the jury has virtually found the fact that the accounts were rendered to the partnership, and the only ground on which we could interfere with the verdict would be, that it was contrary to evidence, or violated some rule of law. There is no direct evidence of the reception of the accounts by either of the partners, but there is evidence from which the reception on the part of the defendant may be inferred. It is such as produces conviction on our minds of the fact, and fully authorises, nay obliges, men who have consciences, to consider it as established.

*Harding*, a witness, swears, that the accounts-current offered exhibit the state of the accounts between the plaintiffs and *Bullard* & *Clanton*, during the period embraced by them ; that the defendant was the business partner of the firm , he attended to the money arrangements, and *Clanton* attended to the plantation. The defendant frequently called at the counting-house of the plaintiffs, and talked of his accounts. He never, to the knowledge of witness, made any objections to the accounts as they were kept, and are here exhibited. Witness made out for the defendant the original accounts, of which those pre-

sented are copies. Witness did not hand them to the defendant, but they were delivered to *Mr. Thompson,* one of the plaintiffs, to be handed to the defendant, as he resided in the city. They were made out as in the usual course of business, similar accounts were for the other customers. Has no knowledge that the defendant received the accounts thus made out. When they were handed to *Thompson,* he took them, went out, and returned without them.

The defendant has made his defence in person, though assisted by counsel, and, in an elaborately prepared argument, filed on the 18th October, 1844, thus treats this branch of the subject: " But the receipt given at the time must be given and accepted without fraud or surprise. Now, I know very little about double entry. I do not know that I yet understand that account. After receiving from *Lambeth & Thompson* a receipt for the proceeds of the cotton without special imputation, I could not imagine that the account-current rendered afterwards would give a different direction to the funds; and, as the account was with the usual reservation of errors excepted, I had no curiosity to look into it until the final settlement, and I never was called on for such final settlement."

If the jury had before them this argument, and gave to it the sense which its language fairly implies. and considered it as fortifying the testimony which we have stated, they did what they were justified in doing, and which we feel ourselves bound to do. We cannot consider the verdict, in this respect, unsupported by evidence.

No objection having been made to the imputation of payments in the accounts until the institution of this suit, according to the decision in *Bloodworth's* case, they must be considered as having been made by the authority of the debtor himself. We do not think there is any ground for the complaint against the form of the accounts, as rendering them not easily understood. They are free from complexity, and simple and clear.

Before leaving this branch of the subject, it is proper to add, that the imputations exhibited by the account are such as any man of business would expect to be made of the proceeds of the crops. *Bullard & Clanton* were constantly drawing on their factors for their immediate wants, such as planters usually have, and of which they appear to have had their full share. The supplies for the plantation must be furnished; its expenses must be paid; the sums required for the partners must be had. Thus there was a continued drain upon the funds in the hands of the parties by the orders and drafts of the partners; and yet it is contended that, in the face of these acts of the parties and their relation as planter and factor, every thing else was to be disregarded in the application of the proceeds of the crops, and they were to be applied to this *solidary obligation,* secured by mortgage, leaving the factor to the mere joint liability of the planters for even the very advances which had enabled them to produce the crops. Certainly the imputation thus insisted on by the defendant is not such a one as any man of common intelligence and prudence would require or accede to, under the circumstances disclosed by the correspondence and the state of the accounts between the parties. Vide 2 Greenleaf on Evidence, 529.

It is to be observed that the imputations made by the plaintiffs are objected to, solely that they ought to have been applied to the extinguishment of the mortgage note, as being the most onerous. No question is made concerning the right of the plaintiffs in making the imputation on any other ground, and no distinction is made as to any of the debts paid, or advances made, by *Lambeth & Thomp-*

DUNBAR
*v.*
BULLARD.

son, and charged by the partnership; and as we differ widely in our conclusions from the court before which this appeal was first argued, we add another view of the subject which is to us obvious, and decisive as to the law of the case, as it is presented by the facts.

The note is, on its face, not a note given by the partnership of *Bullard & Clanton*, but by the two persons, *H. A. Bullard* and *James Clanton*. They bind themselves *in solido*, and not as partners. It is alleged in the answer, that the note was given as part of the price of a tract of land purchased by them jointly, as partners in the planting business; but the act of sale purports to convey the property not to *Bullard & Clanton*, as partners, but to *Henry Adams Bullard* and *James Clanton*.

In order to give this defence the semblance of validity, it was necessary that this note should be a partnership note, and it was so pleaded; but the fact has not been proved. There is no evidence of it. If any real estate was included in this partnership, the contract of partnership must be in writing, according to the rules prescribed for the conveyance of real estate. Civil Code, art. 2807. And in order to test the legality of the position assumed in the defence, let us suppose the fund to be in the hands of the plaintiff unappropriated, and at the disposition of the court under the respective rights of the parties.

It is in vain to attempt to disguise the result, if this defence succeeds. It is that the creditors of the partnership of *Bullard & Clanton* are to be left unpaid, with the partnership funds in their hands, and this diversion of the funds is to be for the benefit of the creditors of the individual partners. What is the note sued on? The joint and several obligation of *H. A. Bullard* and *James Clanton*. If that be paid, their creditors are benefited by it for the amount of the debt extinguished, to the wrong and detriment of the partnership creditors. If the debt of the plaintiffs—the plantation or factorage debt, be paid, no one is wronged. Partnership property must be applied to the payment of partnership debts, in preference to those of the individual partners; and *Lambeth & Thompson* have so applied it. Civil Code, art. 2794. If the fund were now to be disposed of, under the case as it is before us, the imputations of payment would stand in law, and the parties be left in *statu quo*.

These are the conclusions to which we have come after a careful consideration of the questions presented to us. Those of fact rest upon the verdict of a jury, not of merchants or factors in the capital, but taken from among those who are familiar with the relations of the parties, and have no bias in favor of factors or their interests. Those of law are of so familiar a character, that we should not be authorised in dwelling on them, except for the reasons before mentioned in this opinion.        *Judgment affirmed.*